## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**CRIMINAL ACTION NO. 1:21-CR-00355-RBW**
**UNITED STATES OF AMERICA,**                                      **PLAINTIFF,**

**vs.**

**LORI ANN VINSON,**                                               **DEFENDANT.**

### DEFENDANT LORI VINSON'S SENTENCING MEMORANDUM

Comes the defendant, Lori Ann Vinson ("Defendant", or, in the alternative, "Mrs. Vinson"),  by counsel, and respectfully requests this Honorable Court to consider the following factors and sentence Mrs. Vinson to a term of five years of probation; 100 hours of community service; and $500 in restitution.  In support, the Defendant states as follows:

### I.  INTRODUCTION

The Defendant pled guilty to one count of Parading, Demonstrating, or Picketing in a Capitol Building (Count 4 of the Information) pursuant to Federal Rule of Criminal Procedure 11(c)(1)(B) on July 27, 2021.  DN 30.  Mrs. Vinson is scheduled to be sentenced on October 22, 2021.  She is respectfully requesting the Court impose a probated sentence with the condition of community service and restitution, consistent with the 11(c)(1)(B) plea agreement.  Such a sentence would be sufficient but not greater than necessary pursuant to 18 U.S.C. §3553(a) and (b) because (1) Mrs. Vinson did not directly participate in any acts of violence or property destruction while in the Capitol on January 6, 2021; (2) she has no prior criminal history and has maintained stable employment as a registered nurse for most of her adult life; (3) she cooperated with the FBI by submitting to an interview and providing access to the contents of her phone; (4) she continued to cooperate with the government once she was charged by promptly executing the agreed

1

protective order and providing further access to her phone; (5) she agreed to plead guilty and take responsibility for her actions early on in the litigation process;  and (6) despite earlier remarks to the media that were made while upset over her job loss, has great remorse for her actions on January 6, 2021.

## II.  PRE-SENTENCE REPORT

### A.      Factual Objections

The Defendant does not have any factual objections to the final Pre-sentence Report ("PSR").  DN 39.

### B.      Legal Objections

The Defendant objects to the exclusion from the PSR of a departure pursuant to U.S. Sentencing Guideline §5H1.6.  Mrs. Vinson stipulates that the guidelines do not apply to the offense to which she has pled guilty.   In the event the Court considers the guideline range applicable to the dismissed counts, the Defendant respectfully requests the Court consider this departure.  The basis and supporting arguments for the departure are contained in Section V(D) below.

## III.  STATUTORY SENTENCING RANGE, ADVISORY GUIDELINE RANGE, AND PLEA AGREEMENT RECOMMENDATION

Mrs. Vinson pled guilty to Parading, Demonstrating, or Picketing in a Capitol Building in violation of 40 U.S.C. §5104(e)(2)(G), a Class B Misdemeanor.  This offense carries a maximum term of imprisonment of six months pursuant to 40 U.S.C. §§5104(e)(2)(G) and 5109(b); a maximum fine of $5,000 pursuant 18 U.S.C. §3571(b); and a special assessment fee of $10 pursuant to 18 U.S.C. §3013.  Mrs. Vinson is eligible for up to five years probation pursuant to 18

U.S.C. §3561(c)(2).  This offense is not subject to a term of supervised release.  18 U.S.C. §§ 19 and 3583(b)(3).

The U.S. Sentencing Guidelines do not apply to this count of conviction which is a Class B misdemeanor.  USSG §1B1.9.  As noted in the PSR, had Mrs. Vinson been convicted of Counts 1 and/or 2 of the Information, the U.S. Sentencing Guidelines would apply.  DN 39 at ¶67.  Pursuant to USSG §2B2.3, for Counts 1 and 2, Mrs. Vinson's total offense level would be 4 if she pled to these counts.  *Id.*  She has zero criminal history points and, thus, would fall within a Criminal History Category I.  *Id.* at ¶¶24-26 and 67.  This would result in a guideline range for Counts 1 and 2 of 0 to 6 months.  *Id.* at ¶67.

The United States agreed to recommend dismissal of Counts 1, 2 and 3 in exchange for the Defendant's plea to Count 4.  DN 30.  However, there is no recommendation by the United States as part of the plea to a specific sentence on Count 4.  *Id.*

## IV.  SENTENCING LAW

Pursuant to 18 U.S.C. §3553,  the Court "shall impose a sufficient, but not greater than necessary" sentence.  Specifically, 18  U.S.C. §3553(a) provides:

**(a) Factors to be considered in imposing a sentence.**--The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider--

**(1)** the nature and circumstances of the offense and the history and characteristics of the defendant;

**(2)** the need for the sentence imposed--

**(A)** to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

**(B)** to afford adequate deterrence to criminal conduct;

**(C)** to protect the public from further crimes of the defendant; and

**(D)** to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

**(3)** the kinds of sentences available;

**(4)** the kinds of sentence and the sentencing range established for--

**(A)** the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines--

**(i)** issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

**(ii)** that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced; or

**(B)** in the case of a violation of probation or supervised release, the applicable guidelines or policy statements issued by the Sentencing Commission pursuant to section 994(a)(3) of title 28, United States Code, taking into account any amendments made to such guidelines or policy statements by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28);

**(5)** any pertinent policy statement--

**(A)** issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code, subject to any amendments made to such policy statement by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

**(B)** that, except as provided in section 3742(g), is in effect on the date the defendant is sentenced.

**(6)** the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

**(7)** the need to provide restitution to any victims of the offense.

For those offenses for which there is no applicable sentencing guideline, "the court shall also have due regard for the relationship of the sentence imposed to sentences prescribed by guidelines

applicable to similar offenses and offenders, and to the applicable policy statements of the Sentencing Commission."  18 U.S.C. §3553(b)(1).

## V.  THE APPROPRIATE SENTENCE FOR MRS. VINSON

### A.  Relevant Facts of the Offense for the Court to Consider (18 U.S.C. §3553(a)(1))

Prior to January 6, 2021, Mrs. Vinson had never participated in a protest.  She is not a member of any radical groups; nor did she organize or partake in the organization of the protest on January 6th.  Likewise, she was not part of a larger organization in attendance that day.

On January 5, 2021, Mrs. Vinson and Thomas Vinson (a co-defendant in this case) drove to Washington, D.C. to attend the "Stop the Steal" rally featuring former President Donald Trump. Mr. Vinson is an U.S. Air Force veteran and he, along with Mrs. Vinson, wanted to attend the rally to voice their opinion and support of  Trump.  Mrs. Vinson had never been to Washington, D.C. before, so they walked around the downtown area on the date of arrival.  Mrs. Vinson did not hear any plans or talk from other protestors to go to the Capitol the next day.

On January 6, 2021, the Vinson's went to what Mrs. Vinson considered the "back lawn" of the White House where a stage was erected for the rally.  Around 12:00 p.m., Trump gave a speech on that stage and thereafter, the crowd started moving down the street toward the Capitol.

Mrs. Vinson entered the Capitol building at 2:18 p.m. by walking through the open 1st floor Senate Wing Door, as pictured below.



DN 1-1 at p. 6.

Per security camera footage provided as part of discovery, the Vinson's entered the Capitol approximately five (5) minutes after the 1st floor Senate door had been opened.[1]  The footage also shows that hundreds of individuals entered through that door prior to the Vinson's.

After walking through the door, Mrs. Vinson and her husband turned right and then walked out of the room toward the Crypt, as pictured below.



*Id.*

The Vinson's traveled to the Crypt through a corridor with a large group of protestors; the corridor consisted of wall-to-wall people.  In the Crypt, a large crowd formed with the Vinson's in the middle.  Per The Resistance.Video recently provided by the United States, at one point, Mrs. Vinson is observed near the front of the police line, but she is not yelling, confronting or being

---

[1] Per the security camera videos provided in discovery, the initial entry through the window (discussed in the U.S. Sentencing Memo) occurred prior to the Senate Wing door being opened by protestors.  The latter was opened at 14:13:31 (2:13 p.m.).

aggressive in any way toward the officers.  She is standing there, not saying anything or looking down at her phone.  She is captured in this video for almost 2 minutes while in the Crypt, exhibiting no acts of aggression or encouragement of same.  In fact, she disappears from the front of the crowd and goes back into the middle of the crowd prior to the police line breaking.  The Resistance.Video at 16:55-18:49.  An assault happens to an officer and the line breaks in the Crypt, but, based upon security camera video provided in discovery, this occurs at the other end of the Crypt and not where the Vinson's are located.

From the Crypt, the Vinson's go down the OAP Corridor, up a set of stairs and into the Rotunda.  According to security cameras, they entered the Rotunda at approximately 2:34 p.m. When they first arrived in the Rotunda, there was no exit available from the building.  They wandered in and out of the Rotunda approximately 18 minutes before finally exiting through the Rotunda exterior door that had been opened while they were in the Rotunda.  It should be noted that neither of the Vinson's entered the Senate or House chambers.

Mr. and Mrs. Vinson were captured on surveillance video for most of the time they were in the Capitol.  At no time while in the Capitol are the Vinson's captured being violent or destroying property.  It further does not depict either of them encouraging other protestors to be violent or destroy property.  There is no indication either that the Vinson's had any confrontations with law enforcement officers or other Capitol personnel.  The footage shows them walking around and sometimes taking photos or videos.  No images are captured of the Vinson's being violent, inciting violent actions, confronting law enforcement or committing acts of property damage because they did not do any of these things.

Per Mrs. Vinson, at one point they witnessed an individual pick up a stanchion and hit Senator Mitch McConnell's door with it.  After observing these actions, they determined that they

should no longer be in the Capitol and sought out an exit.  Per the surveillance videos, it appears that the Vinson's exited the Capitol through the Rotunda door at 2:52 p.m.  Thus, they were in the Capitol for a total of 34 minutes.

Mrs. Vinson cooperated fully with the government in this matter.  Just two days after the January 6th events, on January 8, 2021, Mrs. Vinson found a card from the FBI on her front door.  She contacted the agent via telephone.  On that same day, Mr. and Mrs. Vinson gave a recorded statement to FBI Agent Dave McClellan admitting that they went in to the Capitol.  A week later, on January 15, 2021, Mrs. Vinson gave another recorded statement to the FBI.  This statement provided more detail and she answered all follow-up questions asked of her.  On February 23, 2021, the FBI went to the Vinson's residence to arrest them for the instant offense.  They were not home, so the FBI agents called them.  Mrs. Vinson answered the phone and agreed to meet the agents at the FBI Owensboro Resident Agency.   At 12:22 p.m. on the same day, Mr. and Mrs. Vinson went to the FBI's Owensboro office and turned themselves in.  As instructed, they brought the clothes they were wearing on January 6th and Mrs. Vinson's cellular telephone.  Mrs. Vinson signed a consent to search her phone and provided the agents with her passcode.  Candidly, she limited this consent to exclude conversations with her husband.  Later, at the request of the prosecutor in this case, she executed a full consent so agents could review the conversations with Mr. Vinson.

Before her second statement to the FBI, Mrs. Vinson was interviewed by two local television stations.  On January 13, 2021, she discussed her involvement in the January 6th events, as well as, her recent firing as a result of same.  In relation to the latter, she stated that she told her employer, "I felt like what I had done was justified, and so I just said I would do this all over again tomorrow.  I'm sorry that you don't see my worth."  https://fox17.com/news/kentucky-nurse-fired-

for-entering-us-capitol-during-riot.  The next day, another television station featured an interview with Mrs. Vinson about her January 6th participation and subsequent firing.  At that time, she candidly did not express remorse for her actions.  https://14news.com/2021/01/15/ascension-st-vincent-nurse-loses-job-involvement-us-capitol-riots/. Since that time, Mrs. Vinson, as evidenced by her cooperation with the government and expedited plea, has changed her beliefs and attitude toward the events at the Capitol.

Mrs. Vinson was charged via Information on May 12, 2021.  DN 16.  Discovery was subsequently provided July 20, 2021; August 23, 2021; and September 14, 2021.  DN 36-38.  An offer was made in this matter on July 9, 2021.  DN 30.  Mrs. Vinson accepted this offer on July 22, 2021, before most of the discovery was received and reviewed.  *Id.*  Further, Mrs. Vinson accepted the plea knowing full well that this Court has the absolute discretion in sentencing her, which could include jail time up to 6 months.

### B.  Mrs. Vinson's History and Characteristics (18 U.S.C.§3553(a)(1))

Mrs. Vinson is 50 years old.  DN 39 at p. 2.[1]  She currently resides in Morganfield, Kentucky in a home owned by her and her husband.  *Id.* at ¶35.  They have lived in their home for approximately 12 years and in their prior residence for over 10 years.  *Id.*  Morganfield, Kentucky is located in the western part of Kentucky.  *Id.*  Mrs. Vinson has called this area of Kentucky home her entire life.  *Id.*

Mrs. Vinson experienced a "somewhat...tumultuous childhood."  *Id.* at ¶33.  When her parents divorced when she was 11 years old, her mother did not accept her seeing her father.  Mrs. Vinson's brother went to live with her father, so she did not get to see either her brother or her

---

[1]  Mrs. Vinson turned 50 between the drafting of the PSR and the filing of this sentencing memo.

father.  Her mother was an alcoholic and Mrs. Vinson believes she suffered from an undiagnosed mental illness.  *Id.*  While living with her, Mrs. Vinson's life was chaotic because of her mother's erratic behavior and, as a result, she felt very "disoriented as a a child." *Id.*  At the age of 16, Mrs. Vinson went to live with her father and did not speak to her mother for 10 years. *Id.*  Despite this, she was able to establish a close relationship with her brother and found a mother figure in a family friend with whom she still remains close and relies on as a support system.  *Id.*

Mrs. Vinson has been with Thomas Vinson for 25 years; they have been married 21 of those years. *Id.* at ¶34.  She and Mr. Vinson, together, have six (6) adult children.  *Id.*  One of Mr. Vinson's sons continues to reside with the Vinson's.  *Id.*  She is a grandmother to nine (9) grandchildren.  *Id.*  Mrs. Vinson is very active in her children and grandchildren's lives. In fact, Mrs. Vinson was a stay-at-home mom until she went back to school in her mid-30's to become a nurse.

Mrs. Vinson has no criminal history.  *Id.* at ¶¶24-29.  Further, she has been on pretrial release since March 16, 2021 and has been compliant with all conditions of same.  *Id.* at ¶¶7-8. She has been law-abiding and supportive of law enforcement her entire adult life.  *See* letter from retired Kentucky State Police Trooper Jared Beauchamp, attached as **Ex. A.**

Mrs. Vinson, as well as her husband, is a hard worker and has great compassion for others. As evidenced by the attached letter from Chuck Condiffe, Jr., Mrs. Vinson has a long history of helping and caring for others.  *See* Chuck Condiffe letter, attached as **Ex. B**.  Additionally, she and Mr. Vinson own 36 rental properties for low-income residents.  DN 39 at ¶54.  They are not just landlords, but help out those tenants by providing transportation, food and money.  *See* letters from tenants, Monica Pharm and Lonnie Hawks, attached collectively as **Ex. C.**  Among the residents of these rentals is a mentally disabled 24 year old male, Blake Henson, for whom Mrs. Vinson is

his Social Security payee.  DN 39 at ¶54.  Accordingly, she oversees all his finances, helping him to pay his bills.  *Id.*  In addition, she physically checks in on Blake on a daily basis to ensure that he is properly caring for his health and hygiene.  *Id.* and Hawks letter, *supra.*  Blake is no longer supported or helped by his family and Mr. and Mrs. Vinson have essentially taken him in as one of their own.  *See* Hawks letters, *supra.*

While this case has been pending, Mrs. Vinson was caring for her mother who was diagnosed with throat cancer.  *Id.* at ¶32.  Although she had a strained relationship with her mother, during the last year and half of her mother's life, she moved in with Mrs. Vinson so she could care for her.  *Id.*  Unfortunately, during her final days, Mrs. Vinson's mother could not speak due to the removal or her tongue and voice box.  *Id.*  Her mother died on May 5, 2021.  *Id.*

Mrs. Vinson  went back to school later in life and obtained an Associate's Degree in nursing in 2005 at the age of 34.  *Id.* at ¶47.  Eleven years later,  when she was in her 40's, she went back to school and obtained her Bachelor's Degree in Nursing.  *Id.* She is currently employed as a traveling registered nurse with Flex  Care.  *Id.* at ¶51.[2]  Mrs. Vinson has provided care and training for COVID treatment throughout the pandemic as an essential worker.  She continues to provide care to at-home, high risk patients in this regard.

As evidenced by the PSR, Mrs. Vinson has a significant employment history:

| June 2005–May 2006 | Regional Medical Center as RN on Orthopedic/Urology floor |
|---|---|
| May 2006–Sept. 2014 | Methodist Hospital–RN in OR |
| Aug. 2011–Sept. 2014 | St. Thomas Health System as an RN |

---

[2]  The PSR notes that Mrs. Vinson has not advised her employer of the current charges.  Due to her prior issues with employment after January 6, 2021, she is waiting until final sentencing to discuss the charges.  It should be noted that the undersigned has consulted with a member of the Kentucky Nursing Board and it is believed that Mrs. Vinson may receive a reprimand in the form of a fine and/or additional training for this conviction.

| | |
|---|---|
| Sept. 2014–December 2015 | Veterans Administration as an RN in OR--preparing equipment and instruments for surgery |
| Dec. 2015–Sept.  2016 | Crittenden Health Systems as supervisor of medical/surgical floors, ICU and ER |
| Sept. 2016–April 2017 | Redbanks as a RN (overlapping with Select Specialty Hospital) |
| Feb. 2017–Nov. 2018 | Select Specialty Hospital as a RN (overlapping with Deaconess Hospital) |
| July 2018–May 2019 | Deaconess Hospital as a RN (overlapping with her time at St. Vincent's) |
| Oct. 2018–January 2021 | St. Vincent's Health Center as a RN |
| March 2021–July 2021 | Helms Home Care as a RN |
| July 2021–present | Flex Care as travel RN |

*Id.* at ¶¶51–53h.

Because of Mrs. Vinson's love for her work, she was very upset when fired by her employer.  The loss of her job, per her employer, was based solely on her actions at the Capitol on January 6.  *Id.* at ¶53.  As a result, when contacted by local news organizations shortly after her firing to give her side, she provided two (2) interviews.  Both of these interviews centered around the loss of her job.  As stated at her Change of Plea hearing, she made statements during those interviews that she now regrets and they were made at a time when she was very angry at her employer.  Further, she wants to make it clear to the Court, the government and all those put in harm's way on January 6, that her statements that her actions were "justified" and she would "do this all over again tomorrow" were in reference to her beliefs that the election was stolen and standing up for her belief in same.  She in no way condones or justifies the violence that occurred

on January 6, 2021.  Those actions, she does not find justifiable and she would not participate in same if given a chance.  *See* October 10, 2021 letter from Lori Vinson, attached as **Ex. D.**

In sum, Mrs. Vinson, along with her husband, do not have a history of protesting or radical behavior.  Up until January 6, 2021, they were upstanding, law abiding citizens.  Indeed, Mrs. Vinson does not have a criminal record.  They are parents and grandparents who are life-long residents of their community.  They both contribute to their community with steady employment and contributions to low-income citizens.  Their actions on January 6, 2021 are inconsistent with their life-long behavior.

### C.  The Need for the Sentence Imposed (18 U.S.C. §3553(a)(2))

Taking into account Mrs. Vinson's history and characteristics, in combination with the facts of the offense, a probated sentence with community service would (1) reflect the seriousness of the offense; (2)  promote her respect for the law; (3) provide just punishment for the offense; (4) afford adequate deterrence to criminal conduct; and (5) protect the public from further crimes of the defendant.  Each of these will be addressed in turn.

### 1.  A Probated Sentence Would Reflect the Seriousness of the Offense.

A probated sentence would reflect the seriousness of the offense.  The United States argues that Mrs. Vinson, while not personally participating in any violent or destructive acts, due to her presence and encouragement–by adding to the crowd of protestors, is indirectly responsible for the actions of the group.  Mrs. Vinson understands that this is a special concern of the Court as well. And for this, there is no defense.  Mrs. Vinson concedes that what occurred on January 6, 2021 was a serious offense and there are few other instances in history more serious.  She admits that she was part of the crowd that entered the Capitol.  Again, for this, there is no defense.  This is why Mrs. Vinson admitted to her guilt early on in this case.

With this said, the determination of the seriousness of the offense should be based on Mrs. Vinson's individual conduct.  From review of other sentencing memos filed by the United States, the government looks at several factors of the individual defendants in determining a "fair and just sentence" for each defendant.  These factors are: (1) whether, when, and how the defendant entered the Capitol building; (2) whether the defendant engaged in any violence or incited violence; (3) whether the defendant engaged in any acts of destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition.

Here, there are mitigating factors that the United States took into account in not only charging Mrs. Vinson with misdemeanors only, but ultimately offering to dismiss all but one B misdemeanor count.  It is these factors that Mrs.Vinson respectfully requests the Court consider and to render a sentence of probation for her actions.  First, Mrs. Vinson and her husband went to Washington, D.C. on their own; they were not part of any radical or violent organization or groups, nor were they part of any groups or organizations that organized the rally.  Second, after attending the Trump rally, they followed the crowds to the Capitol and walked through an open door into the building that had been open for several minutes with multitudes of people entering ahead of them. They did not break any windows or entrances to get inside.  Third, the Vinson's did not engage in any acts of violence, incite violence, engage in any acts of destruction or incite any acts of destruction.   There is no evidence that they had confrontations with law enforcement officers or encouraged anyone to do so.  They are not observed yelling at officers or others.  The Vinson's

are not observed holding signs or shouting in any of the videos.  When the Vinson's did personally witness someone damage Senator McConnell's door, they did not encourage that individual, but instead, it spurred them to get away from this person and leave the building.  Fourth, the Vinson's were in the building for approximately 34 minutes.  Once in the Rotunda, they are observed wandering in and out of the four doors of that room for approximately 18 minutes (half the time they are in the Capitol) and eventually exiting.  Fifth, Mrs. Vinson did make statements on social media admitting to being in the Capitol and further made statements to the media about her firing and participation in the January 6th events.  At the time she made these statements, she was attempting to justify her actions in the face of losing her job.  She made these statements just days after her trip to Washington DC and her firing.  She was upset at the time because she was fired. Since that time, however, her attitude toward the events and her actions have changed.  This is first evidenced by her full cooperation with law enforcement and continued cooperation with the government.  This is further evidenced by her acceptance of a plea and responsibility for her actions early on in this case; she accepted a guilty plea within 2 weeks of the first offer.  Lastly, her remorse is evidenced by the attached letter to the Court.  *See* Lori Vinson letter, *supra.*

## 2.  A Probated Sentence Would Promote Respect for the Law.

A probated sentence would promote Mrs. Vinson's respect for the law.  Her respect for these proceedings and the rules and regulations have been present since the inception of this case. As evidenced by her behavior while on pretrial services, she respects and has complied with all the Orders of the court and the role of probation.  She has complied with weekly call-in reports, provided all information asked of her, and had no pre-trial violations.  Further, she cooperated with the FBI from the beginning by providing two separate interviews, turning herself in, bringing all items requested by the FBI with her, and providing access to her phone.  When later asked by the

prosecution to allow review of her communications with her husband on the phone, she updated the consent agreement.  She also agreed to plead guilty once an offer was made and is one of the first defendants from January 6th to do so.

Moreover, Mrs. Vinson's lack of a criminal record cannot be emphasized enough.  It demonstrates that, but for her actions on the 6th—one day out of her 50 years—she has followed and respected the law her entire life.  Thus, based upon her lifelong conduct and the conduct while on pretrial supervision, a probated sentence would promote her respect for the law.

### 3.   A Probated Sentence Would Provide Just Punishment.

A probated sentence would also provide a just punishment for someone like Mrs. Vinson, considering her acts on January 6.  As stated above, Mrs. Vinson's actions on January 6, 2021 are out of character with the last 50 years of her life.  Her life has centered on helping others, either through her career as a nurse, as a landlord helping underprivileged tenants, helping a mentally disabled adult, or caring for her terminally-ill mother.  But for January 6, 2021, Mrs. Vinson is a law-abiding citizen who contributes to her community.  To someone like Mrs. Vinson, who has no criminal record, merely having a misdemeanor on her record is just punishment.  She lost her job because of her actions and is facing repercussions with the nursing board.  She has indicated to the undersigned on many occasions, her fear of going to jail, but, understanding that her actions have repercussions.  Living with this uncertainty and stress from these charges has had a great effect on Mrs. Vinson.  A probated sentence, while providing mental relief to Mrs. Vinson, is still considered a serious punishment by her.

Further, because the Defendant is not subject to supervised release, if the Court sentences her to time to serve rather than probation, her sentence would be complete once she is released from custody.  By placing Mrs. Vinson on probation, she would be under a much longer sentence—

up to 5 years—and would be subject to supervision to ensure her compliance with the law. Thus, in determining a sentence, should the Court decide that there exists certain aggravating factors/actions, a sentence of probation for more than the statutory maximum term of imprisonment, would suffice as just punishment for those actions.

### 4. A Probated Sentence Would Afford Adequate Deterrence and Protect the Public from Further Crimes.

A probated sentence would afford an adequate deterrence to Mrs. Vinson and others in her position, as well as, protect the public from further crime by Mrs. Vinson. As to the latter, as emphasized throughout this memo, Mrs. Vinson has no criminal record. And, it is not expected that she will commit any new offenses based upon her prior history and history while on pretrial services supervision. If the Court were to give her a probated sentence, she would be under supervision for up to five years for which she would have to report to probation and submit to all the rules and regulations that the U.S. Probation office deems appropriate. As history has shown, this type of supervision is effective for Mrs. Vinson and has deterred any criminal conduct. Further, because of the stressful experience of being charged with a federal offense and all the legal and personal repercussions, Mrs. Vinson's attitude today is vastly different than on January 6th and the weeks after. When she made statements to the media right after her firing, when she said she would do it again, she was referencing going to a rally, not into the Capitol or the violence. After looking back at the violence at the Capitol, she has advised the undersigned that she would never do anything like that again. In fact, she now doesn't want to participate in any type of political rally or protest again.

### D. The Type of Sentences Available and Consideration of Pertinent Policy Statements by the U.S. Sentencing Commission (18 U.S.C. §3553(a)(3) and (7))

This offense carries a maximum term of imprisonment of six months pursuant to 40 U.S.C. §§5104(e)(2)(G) and 5109(b) and a maximum fine of $5,000 pursuant 18 U.S.C. §3571(b).  Mrs. Vinson is eligible for up to five years probation pursuant to 18 U.S.C. §3561(c)(2).

Although the U.S. Sentencing Guidelines do not apply to Mrs. Vison's offense of conviction, the anticipated dismissed Counts of the Information provide a guideline range of 0 to 6 months.  DN 39 at ¶67.  If the Court were to consider this guideline range, Mrs. Vinson's low end range would be probation.  Thus, the Defendant's requested sentence falls within the range.

Further, if the Court were to consider the U.S. Sentencing Guideline ranges, it would only be fair and appropriate to consider any departures thereto.  In this instance, Mrs. Vinson would qualify for a departure pursuant to USSG §5H1.6.  A departure under this guideline is appropriate if family circumstances are "present to an exceptional degree or in some other way makes the case different from the ordinary case."  *Koon v. U.S.,* 518 U.S. 81, 96 (1996).   Application Note 1(B) to USSG §5H1.6 states:

> **Departures Based on Loss of Caretaking or Financial Support.**–
> A departure under this policy statement based on the loss of caretaking or financial support of the defendant's family requires...the presence of the following circumstances:
> (i) The defendant's service of a sentence within the applicable guideline range will cause a substantial, direct, and specific loss of essential caretaking, or essential financial support, to the defendant's family.
> (ii) The loss of caretaking or financial support substantially exceeds the harm ordinarily incident to incarceration for a similarly situated defendant.
> (iii) The loss of caretaking or financial support is one for which no effective remedial or ameliorative programs reasonably are available, making the defendant's caretaking or financial support irreplaceable to the defendant's family.
> (iv) The departure effectively will address the loss of caretaking or financial support.

If the Court does not consider a departure under the guidelines appropriate, it is the Defendant's position that a variance based upon these factors is equally appropriate. *See* 18 U.S.C. §3553(b)(1)("the court shall impose a sentence of the kind, and within the range…unless the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the sentencing commission").

Mrs. Vinson oversees the financial and physical care of a 24 year old mentally disabled adult. She was appointed by the Social Security Administration in March of 2021 as Blake's payee. He lives on a property owned by Mrs. Vinson and she oversees his finances to ensure that his bills are paid and his needs are met. She sees Blake every day to ensure that he is properly eating, grooming and, generally, that he is in good health. Without her financial and physical help, he would not be able to take care of himself. Notably, this relationship began when Blake's parents kicked him out and he was homeless for a couple of months.

If the Court were to impose a sentence of imprisonment for Mrs. Vinson, such sentence would cause a substantial, direct and specific loss of both essential caretaking and financial support of Blake. His parents are not in the picture. Before Mrs. Vinson came along, he was not able to properly care for himself or his finances and he was homeless. He needs her daily assistance to properly pay his bills and to physically take care of himself. Because Blake is an adult and their location in a small rural area, there are few, if any, programs that could help him. It is doubtful that the programs available could offer the daily physical and financial assistance that Mrs. Vinson now provides. Indeed, a new payee would have to be designated by the Social Security Administration which could take quite some time and could cause the interruption of receipt of Social Security payments. If the Court were to sentence Mrs. Vinson to probation, there would be no disruption of her care and, thus, would address the concern over such a loss.

Should the Court consider any jail time or home incarceration as a punishment for this offense, Mrs. Vinson respectfully requests the Court grant a departure pursuant to USSG §5H1.6 or a variance under 18 U.S.C. §3553(b)(1).  Specifically, Mrs. Vinson requests a sentence of straight probation as a departure and/or variance in this matter.  This would allow her to continue in her care of Blake without disruption.

### E.  The Need to Avoid Unwarranted Sentence Disparities Among Defendants/ Due Regard for Relationship of the Sentence to Prescribed Guidelines Applicable to Similar Offenses and Offenders (18 U.S.C. §3553(a)(6) and (b)(1))

Thus far, fifteen (15) defendants who pled guilty to similar Class B Misdemeanors in relation to the events of January 6, 2021 have been sentenced.  The following is a summary of those similarly situated to Mrs. Vinson and the sentences imposed.

| Name and Case No. | Offense of Conviction | Statement of Offense and Sentencing Memo Facts | Sentence |
|---|---|---|---|
| Andrew Bennet 1:21-CR-227-JEB | Picketing, Demonstrating, Parading in a Capitol Building (40 U.S.C. §5104(e)(2)(G)) (DN 21) | Bennett entered the Capitol 2 minutes after it was breached at 2:14 p.m. and remained for 29 minutes.  He committed no acts of violence or destruction.  He was wearing a hat with FAFO, a slogan popular among the Proud Boys.  Bennett made statements on Facebook "You better be ready chaos is coming and I will be in DC on 1-6-2021 fighting for my freedom!"  Bennett voluntarily interviewed with the FBI; admitted to his actions; and allowed them access to his phone. Bennett has 0 criminal history points due to age of convictions. (DN 22 & 24) | 24 months probation (DN 29) |

| Anna Morgan-Lloyd 1:21-CR-164-RCL | Picketing, Demonstrating, Parading in a Capitol Building (40 U.S.C. §5104(e)(2)(G)) (DN 24) | Morgan-Lloyd entered the Capitol building, walked around for 10 minutes, took photos and posted on Facebook. Additionally, she made Facebook posts and comments, including "I'm here. Best day ever. We stormed the capitol building me and Dona Bissey were in the first 50 people in"; "that was the most exciting day of my life"; "I'm so glad we were there. For the experience and memory but most of all we can spread the truth about what happened and open the eyes of some of our friends." Mogran-Lloyd was interviewed by the FBI and admitted to entering the Capitol. (DN 25) | 36 months probation. (DN 29) |
|---|---|---|---|
| Jessica Bustle 1:21-CR-00238-TFH  Co-Defendant: Joshua Bustle (husband) | Picketing, Demonstrating, Parading in a Capitol Building (40 U.S.C. §5104(e)(2)(G)) (DN 24) | Bustle, who was carrying a sign protesting COVID vaccinations, entered the Capitol at 2:50 p.m. through the Rotunda and was inside for approximately 20 minutes with her husband, Joshua Bustle, until they were forced out of the same door by law enforcement. Before January 6th, she posted on social media "We don't win this thing sitting on the sidelines. Excited to stand for truth with my fellow patriots and freedom fighters in D.C. today." On January 6th, she posted on Facebook "Pence is a traitor. We stormed the capital [sic]..." After the 6th, she posted "we need a revolution! We can accept an honest and fair election but this is NOT fair and patriots don't want to see their country brought into communism and destroyed over a lie." She has several traffic infractions and a misdemeanor disorderly conduct, but would have 0 criminal history points. There is no indication that she cooperated with the FBI. (DN 25 & 39 and DN1-1 1:21-mj-00280-RMM) | 24 months probation with the condition of 60 days home detention. (DN 42) |

| Joshua Bustle 1:21-CR-00238-TFH<br><br>Co-Defendant: Jessica Bustle (wife) | Picketing, Demonstrating, Parading in a Capitol Building (40 U.S.C. §5104(e)(2)(G)) (DN 23) | Statement of Offense is the same of his wife, Jessica Bustle's, above.  He has traffic offenses, but has 0 criminal history points. (DN 24 & 38) | 24 months probation with the condition of 30 days home detention (DN 44) |
|---|---|---|---|
| Danielle Doyle 1:21-CR-00324-TNM | Picketing, Demonstrating, Parading in a Capitol Building (40 U.S.C. §5104(e)(2)(G)) (DN 23) | Doyle entered the Capitol at 2:20 p.m. by climbing through a broken window next to the Senate Wing door.  She walked through numerous areas of the Capitol–Orientation Lobby, the Crypt, the Upper Orient Lobby, the Rotunda, and the Supreme Court Chambers stairs.  She was in the building 20-25 minutes.  During this time, she is seen on camera chanting and yelling at law enforcement officers.  Her prior record consists of traffic offenses and a DUI, but would have 0 criminal history points.  There is no notation that she cooperated with the FBI.  (DN 24 & 27) | 2 months probation (Oct. 1, 2021 Minute Entry) |

Mrs. Vinson's actions are similar to those who received probated sentences.  Like those Defendants, she did not participate in any acts of violence or property destruction.  While she did partake in interviews and make less than desirable statements about her actions, many of those who received probation did the same on social media.  In fact, the other probated Defendants' statements on social media appear to be more encouraging of riotous behavior.  Like most of those who received a probated sentence, Mrs. Vinson cooperated with the FBI by providing two interviews and all evidence requested.  Further, like many of those receiving probation, she has no criminal record.  Lastly, the probated individuals, like Mrs. Vinson, pled early to their offenses.

Compare these defendants who received probated sentences to those misdemeanor defendants who have received a jail sentence (as recommended by the United States here):

| Name and Case No. | Offense of Conviction | Statement of Offense and Sentencing Memo Facts | Sentence |
|---|---|---|---|
| Karl Dresch<br>1:21-CR-71-ABJ | Picketing, Demonstrating, Parading in a Capitol Building (40 U.S.C. §5104(e)(2)(G)) (DN 35) | Dresch was originally charged with felony Obstruction of Justice and, through plea negotiations, pled to a lesser offense.  He was inside for 20 minutes. He made postings on social media after, including, "Took a lil gas…wtf I love masks now!"; "Mike Pence gave our country to the communist hordes, traitor scum like the rest of them, we have your back give the word and we will be back even stronger." Dresch is a convicted felon with 5 criminal history points. When a search of his residence was conducted, officers located a Russian SKS assault style rifle, 2 shotguns, glock pistol and over 100 rounds of ammo. (DN 36 & 33) | 6 months to serve (DN 37) |
| Derek Jancart<br>1:21-CR-148-JEB<br><br>Co-defendant:<br>Erik Rau | Disorderly Conduct in a Capitol Building or Grounds—B misdemeanor (40 U.S.C. §5104(e)(2)(D) (DN 20) | Jancart came armed to the rally with a gas mask.  His co-defendant, Erik Rau videoed the events of the protestors breaking through the police line on the West Lawn and can be heard yelling "We have the police surrounded!  We have you surrounded!"  He scaled the wall to get into the Capitol.  Among the many places he went in the Capitol was the Speaker's conference room where he took a photo of Rau.  He exited the Capitol only after the law enforcement ordered him to do so. His prior history consists of a DUI And several traffic offenses. Before January 6, he posted that he was going to D.C. and "prepared for chemical attacks and whatnot" and "NO EXCUSES! NO RETREAT! NO SURRENDER! TAKE THE STREETS! TAKE BACK OUR COUNTRY! | 45 days to serve (DN 33) |

| | | After January 6, he posted on social media, that the rioters "wanted to let the politicians know we can get this far anytime we want" and "I would like to keep my job at least until the revolution starts."  (DN 21 & 25) | |
|---|---|---|---|
| Erik Rau 1:21-CR-467 | Disorderly Conduct in a Capitol Building or Grounds—B misdemeanor (40 U.S.C. §5104(e)(2)(D) (DN 8) | Same offense conduct as co-defendant Jancart.  In addition, Rau can be heard yelling "go, go, go" on video when rioters push through the police line.  He had to be physically forced out of the Capitol by an officer.  His criminal history consists of juvenile and traffic offenses, as well as, a domestic violence assault for which he was on probation when he incurred these charges.  (DN 9 & 13) | 45 days to serve (DN 21) |
| Robert Reeder 1:21-CR-166-TFH | Picketing, Demonstrating, Parading in a Capitol Building (40 U.S.C. §5104(e)(2)(G)) (DN 20) | Reeder was tear gassed and chanting "Fight for Trump!" when entering the Capitol.  He left the Capitol and then turned back around and re-entered, yelling "USA!"  He recorded an assault on a police officer near the Rotunda and yelling to the officers "you need to retreat!"  He later posted online that "We had to do…ah…battle with the Police inside." (DN 19 & 26) | 90 days to serve (Oct. 8, 2021 Amended Minute Entry) |

The common theme among those misdemeanor defendants that are receiving jail time is (1) the presence of a criminal history,[3] (2) violent social media rhetoric, (3) preparation to fight and/or resist law enforcement; and (4) the encouragement of same.  Those factors are not present in Mrs. Vinson's case.  She was wearing a fuzzy jacket, jeans and ear warmers; not riot gear or gas masks.  She didn't record or encourage violence.  Her statements to the media and on social media did not contain violent rhetoric.  Despite this, the United States' recommendation of 30 days incarceration focuses primarily on her social media activity and statements made to the media after

---

[3] With the exception or Robert Reeder, 1:21-CR-166.

the events.  The key difference between her statements and those defendants who received jail time is the lack of incitement to violence and resistance.  Again, when looking at her social media statements and actions after the January 6 events, they are more in line with statements from those individuals who received probation.

With no guidelines as guidance, the best way to ensure that there is no disparity among sentences, is to look at those similarly situated Defendants who have already been sentenced.  Mrs. Vinson falls in a category of misdemeanor Defendants who have been given straight probation or probation with a condition on home detention.  Mrs. Vinson respectfully requests the Court to sentence her consistent with those individuals.

### F.  The Need to Provide Restitution to Any Victims of the Offense (18 U.S.C. §3553 (7))

As part of the plea agreement, Mrs. Vinson agreed to pay $500 in restitution.  A probated sentence would assist in fulfilling this obligation.  Any imprisonment could result in the loss of Mrs. Vinson's job and, thus, earning ability.  If she were probated, it would ensure that the Defendant gets the money paid back in a timely fashion.  Accordingly, under this factor, probation is warranted.

## VI.  CONCLUSION

For the foregoing reasons, Mrs. Vinson  requests that the Court sentence her to a five year period of probation with the condition of 100 hours of community service and $500 in restitution. This is consistent with the plea agreement entered into by the United States and  would be sufficient but no greater than necessary when considering the factors in 18 U.S.C. §3553.

/s/ Chastity R. Beyl
Federal Defender
200 Theatre Building
629 Fourth Avenue
Louisville, Kentucky 40202
(502) 584-0525

Counsel for Defendant.

## CERTIFICATE

I hereby certify that on October 19, 2021, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to the attorneys of record.


/s/ Chastity R. Beyl